IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Docket Number |
| V. | : | |
| | : | 14-CR-00494-NIQA |
| JAVIER GONZALEZ, | : | |
| Defendant. | : | |

## DEFENDANT'S MOTION TO REDUCE HIS SENTENCE

Now comes Javier Gonzalez ("Mr. Gonzalez") through the undersigned and moves this Honorable Court to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) because of his rehabilitation, the pandemic, the conditions in Fort Dix's Camp, his medical conditions, i.e., anxiety, asthma, allergies, obesity, migraine headaches, pre-diabetes, and the residual effects from the Coronavirus. Mr. Gonzalez respectfully requests the Court to reduce the sentence to time served or, in the alternative, to place him in home confinement.

### The Sentence

On November 13, 2014, Mr. Gonzalez pleaded guilty to Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B),

Possession of a Firearm in Furtherance of a Drug Crime in violation of 18 U.S.C. § 924(c)(1), and Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). On September 22, 2015, the Court sentenced Mr. Gonzalez to 120 months of incarceration. The sentence was composed of a five-year mandatory minimum sentence for the drug offense and a consecutive five-year mandatory minimum sentence for the gun offense. According to the Bureau of Prisons ("BOP"), Mr. Gonzalez will be released on January 23, 2023. A printout from the BOP Web page with the projected release date is attached hereto as *Exhibit* "A." This means that Mr. Gonzalez will serve 102 months and seven days. This computation counted from his arrest on July 17, 2014, to his projected release date on January 23, 2023. This means that when this motion was filed, Mr. Gonzalez would have served 78 months, which is 76 percent of his sentence. It also means that Mr. Gonzalez only has to serve 13 months in custody.

This period has been calculated by deducting from his sentence the time Mr. Gonzalez will serve in a halfway house. A prisoner generally serves six months in a halfway house. In addition, this period can be

increased to 12 months if Mr. Gonzalez makes a request, and the BOP approves it. If that were to happen, then Mr. Gonzalez would only serve 13 months.

Further, the Court should also consider that Mr. Gonzalez has participated in 54  education programs totaling more than 1,000 hours of instructional credits.   Under the First Step Act of 2018[1], Mr. Gonzalez believes that he would have  earned approximately nine months of earned time credits,  which could have also reduced his period of custody, but because of the 924(c) conviction, in this case, he will not get any benefit.

<u>The Legal Requirements to File a Motion for Modification of Sentence</u>

The First Step Act of 2018 amended § 3582. This amendment  allows a defendant to petition the sentencing court to reduce his sentence. Before the First Step Act of 2018, only the BOP was permitted to file this motion.

In deciding a motion to reduce a sentence, the Court must make four findings: (1) whether the Defendant has exhausted administrative rights; (2)

---

[1] First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

whether there are extraordinary and compelling reasons to grant the motion; (3) whether after considering the sentencing factors outlined in § 3553(a) granting the motion is appropriate; and (4) whether granting the motion is consistent with the applicable policy statements of the Sentencing Commission. *See* 18 U.S.C. § 3582(c)(1)(A)(i) & (ii). As the following discussion shows, all factors are present in this case.

<u>The Exhaustion of Administrative Rights</u>

Section 3582(c)(1)(A)(i) allows a defendant to file a motion to reduce his sentence after he has exhausted the administrative rights available within the prison. The Defendant can also file a motion to reduce his sentence if 30 days have elapsed after he made the request to the Warden, and the Warden has not acted. Here, as will be shown below, the Warden did not respond within 30 days to Mr. Gonzalez's request for Compassionate Release.

On April 22, 2020, Mr. Gonzalez asked the Warden to place him in home confinement due to COVID-19 and his medical conditions. On May 31, 2020, Mr. Gonzalez sent an email to the Warden where he explicitly referred to the April 22, 2020, request as follows:

My name is Javier Gonzalez, and I happened to be one of the sickest men in the compound from COVID-19. I am still in the process of recuperating, and am feeling much better. My reason for bothering you is because on April 22, 2020, I sent you a request for Compassionate Release or Sentence Reduction. It's May 31, 2020, and I haven't seen anything back from you, so I figured to just follow up with you about my status. Thank you very much.

*Exhibit* "C," May 31, 2020 Email to the Warden. At this point, 39 days had passed since Mr. Gonzalez requested the Warden to release him under the "Compassionate Release" Program. As such, as early as May 23, 2020, Mr. Gonzalez could have filed a motion to reduce his sentence. Also, on May 31, 2020, Mr. Gonzalez sent an email to Ms. Wright at Inmate Work Assignment, in FCI Fort Dix, where he stated:

On April 22, 2020, I sent you a copy of my request to the Warden for Sentence Reduction or Compassionate Release. It's May 31, 2020, and I haven't seen anything back from the Warden. It's been passed 30 days, so I figure I'd just to follow up with you about it. I know that you may not have access to knowing about his delay, but I figured just to let you know anyway. I am sending him an email as well.

Lastly, I have no access to my paperwork where it's located within my property, and there is no printer in here as well to print information that I need. I have passed my first test and have been proving negative from COVID-19. When I pass my second test this upcoming Tuesday, I will most likely be relocated to the 3rd floor on Wednesday where I will not have access to

computers for 21 days. If by any chance you do come here throughout the week, please bring a copy of my the Sentence Reduction form I sent you on April 22, 2020. My attorney has been bugging me for 2 weeks now. Thank you.

*Exhibit* "D," May 31, 2020 Email to Ms. Wright. This email confirms that Mr. Gonzalez submitted a request for Compassionate Released to the Warden and demonstrates Mr. Gonzalez's effort to get a copy of the request.

On November 5, 2020, Mr. Gonzalez sent the Camp Administrator in FCI Fort Dix an inquiry about his pending request for Compassionate Release. Specifically, Mr. Gonzalez stated:

I, Javier Gonzalez put in for Compassionate Release in April of 2020. I haven't ever received a response ever since. Can you please update me on my status. Thank you.

*Exhibit* "E," November 5, 2020, Email to Camp Administrator. At this point, at least 197 days had passed since Mr. Gonzalez's April 22, 2020, request for Compassionate Release.

On November 8, 2020, Mr. Gonzalez again requested information from the Camp Administrator about his April 22, 2020 request for Compassionate Release. Mr. Gonzalez stated:

May I ask why my pending is taken so long? I was one of the

campers who was very sick when contracting COVID-19. For 3 months, I lived in an uncomfortable environment (51 building in the low), only to return to the Camp and learned that practically every inmate has received a conformation via Warden for compassionate release. Please answer. Thank you.

*Exhibit* "F," November 8, 2020, Email to Camp Administrator. On November 20, 2020, Mr. Gonzalez received a response. That is 209 days after the April 22, 2020, request for Compassionate Release. The response was not an approval or a denial of his request for Compassionate Release. Instead, it stated the following:

> Please be advised, <u>the Warden recommend Compassionate Release</u>, but it is granted by the U.S. Courts after another recommendation from the Director of Bureau of Prisons. In addition, the BOP have no control over the U.S. Court.
>
> So to answer your question, your requests is pending medical review. Once your case Manage receive this review it will be forwarded to the Warden for consideration.
>
> I trust this answers your question.

*Exhibit* "G," November 20, 2020 Email from Camp Administrator. (<u>emphasis added</u>). This response states that the Warden recommended that Mr. Gonzalez be released under the Compassionate Release Program. However, despite this recommendation, Mr. Gonzalez was not released. Further, the

response confirms that Mr. Gonzalez did submit a request for Compassionate Release, and that said request had been pending for more than 209 days. Therefore, it is indisputable that Mr. Gonzalez exhausted the administrative rights as required by 18 U.S.C. § 3582(c)(1)(A)(i), i.e., there was a " … lapse of [more than] 30 days from the receipt of such a request by the Warden of Mr. Gonzalez 's facility[.]"

<u>Establishing Extraordinary and Compelling Reasons</u>

Section 3582 permits the reduction of a sentence if there are extraordinary and compelling reasons that warrant the reduction. 18 U.S.C § 3582(c)(1)(A)(i). However, neither the First Step Act of 2018 nor its amendment of 18 U.S.C. § 3582 defines what constitutes extraordinary and compelling reasons. Only the Policy Statement of § 1B1.13 defines extraordinary and compelling reasons. The definition is as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the Defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
> (i) the Defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A

specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) the Defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the Defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—the Defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the Defendant's minor child or minor children.

(ii) The incapacitation of Defendant 's spouse or registered partner when the Defendant  would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the Defendant's case an extraordinary and compelling reason other than, or in

combination with, the reasons described in subdivisions (A) through (C).

Subsection (A) addresses the medical conditions of Mr. Gonzalez, subsection (B) addresses Mr. Gonzalez's age, subsection (C) addresses the needs of Mr. Gonzalez's family, and subsection (D) the other reasons, allows the finding of extraordinary and compelling reasons for unspecified reasons that the Court will deem appropriate. Here, subsection (D) is the applicable section.

Counsel refers to subsection (D) as the catchall provision because the language gives latitude to the Court to consider unenumerated factors. First, the very title of the subsection, "Other reasons," conveys flexibility and inclusion. Further, the language of subsection (D), i.e., " . . . there exists in the Defendant's case [a] . . . _reason other than, or in combination with_, the reasons described in subdivisions (A) through (C)," also conveys flexibility and inclusion. Therefore, under subsection (D), the Court can consider any set of circumstances to determine whether the Defendant has established extraordinary and compelling reasons meriting a reduction of sentence.

Also, while the language of subsection (D) only mentions the Director

of the Bureau of Prisons,  the majority view[2] , including cases in the Eastern

District of Pennsylvania,[3] has concluded that a sentencing court, because of

the First Step Act of 2018's amendment of 18 U.S.C. § 3582, has the authority

to determine if the reasons propounded by the Defendant constitute

extraordinary and compelling reasons under subsection (D).

Please note that as here, where the prisoner is suffering from certain

---

[2] *United States v. Booker*, 976 F.3d 228, 234-37 (2d Cir. 2020); *United States v. Jones*, 234 F.3d 234 (6th Cir. 2020); *United States v. Gunn*, 980 F. 3d 1178 (7th Cir. 2020); *United States v McCoy*, 981 F. 3d 271, 280-83 (4th Cir. 2020); *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019);  *United States v. Brown*, 411 F. Supp. 3d 446 (S.D. Iowa 2019); *United States v. Pabon*, 458 F. Supp. 3d 296 (E.D. of Pa. 2020); *United States v. Marks*, 455 F. Supp. 3d 17 (W.D.N.Y. 2020);*United States v. Cantu*, 423 F. Supp. 3d 345 (S.D. Tex. 2019); *United States v. Redd*, 444 F. Supp. 3d. 717 (E.D. Va. 2020); *United States v. Scott*, 461 F. Supp 3d 851 (E.D. Wis. 2020); *United States v. Haynes*, 456 F. Supp. 3d. 496 (E.D. N.Y 2020); *United States v. Decatur*, 452 F. Supp. 3d. 320 (D. Md. 2020); *United States v. Lisi*, 440 F. Supp. 3d. 246  (S.D.N.Y. 2020);  *United States v. Young*, 458 F. Supp. 3d 838 (M.D. Tenn. 2020); *United States v. Fox*,  2019 U.S. Dist. LEXIS 115388 (D. Me. July 11,  2019);*United States v. Schafer*, 2020 U.S. Dist. LEXIS 86834(W.D.N.Y. May 8, 2020); *United States v. Mel*, 2020 U.S. Dist. LEXIS 74491 (D. Md. April 28, 2020); and  *Maumau*, 2020 U.S. Dist. LEXIS 28392, (D. Utah  February 18, 2020).

[3] *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. of Pa.  2020); *United States v. Adeyeemi*, 2020 U.S. Dist. LEXIS 117743 (E.D. of Pa. 2020); *United States v. Harris*, 2020 U.S. Dist. LEXIS 245018 (E.D. Pa. December 31, 2020), and  *United States v. Pabon*, 458 F. Supp. 3d 296 (E.D. of Pa.  2020).

pre-existing conditions, the U.S. Department of Justice has already accepted

that for purposes of deciding a motion for compassionate release, there are

extraordinary and compelling reasons whenever an individual has one of

the conditions listed by the Center for Disease Control ("CDC"), and the

individual is incarcerated during the pandemic. *See U.S. v. Adeyemi*, 470 F.

Supp. 3d 489, note 121 (E.D. Pa. 2020). Here, as will be demonstrated below,

Mr. Gonzalez has asthma, obesity, pre-diabetes, anxiety, and post-COVID-

19 symptoms. As such, it is respectfully submitted that this case involves

extraordinary and compelling reasons.

In addition, in *United States v. Adeyemi*, 470 F. Supp. 3d 489 (E.D. Pa.

2020) and in *United States v. Harris*, 2020 U.S. Dist. LEXIS 245018 (E.D. Pa.

2020), the Courts stated that other factors in addition to medical conditions,

such as rehabilitation, education while in prison, the time served on a

sentence, and others, can be considered to determine whether extraordinary

and compelling reasons are present. *See also, United States v. Polla*rd, 2020

U.S. Dist. LEXIS 144383 (E.D. Pa. August 12, 2020) and *United States v.*

*Clausen*, 2020 U.S. Dist. LEXIS 131070 (E.D. Pa. 2020). As such, in this case, it

is respectfully submitted that even if the Court concludes that the Defendant

has not established one of the conditions enumerated by the CDC, the other

factors discussed below establish extraordinary and compelling reasons.

<u>Mr. Gonzalez's Medical Condition</u>

<u>Asthma, Allergies, and Sinusitis</u>

Mr. Gonzalez has moderate asthma. Moderate asthma is present if any

of the following are present: 1) symptoms occur daily and inhaled short-

acting asthma medication is used every day; 2) Symptoms can interfere with

daily activities; and 3) night symptoms occur more than one time a week

but not every day. [4] Mr. Gonzalez has suffered from moderate asthma for

many years. Sometimes he experiences daily symptoms. He has been

prescribed an albuterol inhaler before and during incarceration, and he has

to use it four times a day as needed. *See Exhibit* "H," p. 328. An albuterol

inhaler is a short-acting asthma medication. *Id.* pp. 144, 150, 209, 221, 236,

259, 269, 299, 303, 326, and 327. Mr. Gonzalez also suffers from allergies and

sinus problems. *Id.* pp. 6 and 243. Allergies and sinus infections are known

---

[4] https://www.uofmhealth.org/health-library/hw161158

as asthma triggers, which also exacerbate his condition. Moderate asthma is recognized by the CDC as a one of the pre-existing conditions that can place an individual in higher risk of severe illness or even death if the person gets infected with COVID-19.[5]

### Obesity and Resulting Complications

Mr. Gonzalez is obese; he has a Body Mass Index (BMI) of 33.[6] *See Exhibit* "H," pp. 260, 300, 326, and 327.   A person with a BMI higher than 30 is considered obese.  Obesity has negatively affected the hospitalization rates of COVID-19 patients, and the vaccine has had suboptimal results in obese patients.[7]  The CDC explicitly states that obesity increases the risk of severe illness from COVID-19.[8]   Mr. Gonzalez's obesity may also affect his ability

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-with-medical-conditions.html#asthma.

[6] https://www.cdc.gov/obesity/adult/defining.html.

[7] https://www.rethinkobesity.com/resources/educational-materials.html?

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

to breathe.[9] Obese patients have an increased risk of Acute Respiratory Disease Syndrome ("ARDS"). Obese patients, particularly younger patients, may have a compromised respiratory function, and obesity can cause compression of the diaphragm, lungs, and chest cavity. Obesity also causes low-grade inflammation and an increase in pro-inflammatory cytokines, which plays a role in the worst COVID-19 outcomes. *See* Ronin Caryn Rabin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, New York Times, April 17, 2020.[10] As stated this article by Obesity is more important for hospitalization than high blood pressure, diabetes, coronary disease, cancer, kidney, or pulmonary disease. *Id.*

COVID-19

Mr. Gonzalez was diagnosed with COVID-19 on or about April 22, 2020. *See Exhibit* "H" pp. 1 to 242, where the diagnosis and treatment of the

---

[9] https://ccforum.biomedcentral.com/articles/10.1186/s13054-019-2374-0#:~:text=Obese%20patients%20have%20an%20increased,of%20ARDS%20in%20obese%20patients.

[10] https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html

virus is discussed.[11] As a result, Mr. Gonzalez was placed in isolation for more than 90 days, i.e., from April 22, 2020, to July 28, 2020. Maybe even longer, but Counsel does not have complete medical records.[12] Also, on April 26, 2020, Mr. Gonzalez was taken to the Emergency Room of the Robert Wood Johnson University Hospital but was sent back to FCI Fort Dix.  *Id*. *See* p. 201.  Mr. Gonzalez was returned to prison because the hospital advised Mr. Gonzalez that they needed to give the only room they had to another person that was much more ill.  Please note that while Mr. Gonzalez also has had lingering symptoms from the virus, i.e., fatigue, shortness of breath, muscle and body aches, headache, memory problems, dizziness, heart palpitations, hair loss, reflux, abdominal pain, and nausea, most of these symptoms were not notated in his medical records. A person can catch COVID-19 twice.[13]

---

[11] Page 204 has the positive result for the COVID-19 test.

[12] Counsel for Mr. Gonzalez respectfully request leave to amend this submission once he receives the complete medical records of Mr. Gonzalez.
[13] https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some

Clearly, the lingering effects of the Coronavirus, the moderate asthma, the allergies, the sinusitis, and the complications presented by obesity, negatively affect Mr. Gonzalez's respiratory system. As discussed below, respiratory disease is one of the pre-existing conditions identified by the CDC, that when present, can place an individual at a higher risk of severe illness or even death if the person contracts COVID-19.

Pre-Diabetic

Mr. Gonzalez is also pre-diabetic. A person is considered pre-diabetic if he has a Hemoglobin A1C blood level of 5.7 or above. Mr. Gonzalez has a 5.8 Hemoglobin A1C blood level.  Also, Mr. Gonzalez's father has diabetes. *See Exhibit* "H," pp. 247, 319, 320, 321, 322, 323, 324, and 325.   Similarly, the CDC has also stated that having type two diabetes increases the risk of severe illness from COVID-19.[14] Mr. Gonzalez's obesity further increases the risk that he may develop type two diabetes.

Anxiety

Mr. Gonzalez also suffers from anxiety. *See Exhibit* "H" p. 259. Mr.

_____

[14] *Id.*

Gonzalez withdrew from Drexel University because of his anxiety. In prison, he has been prescribed medication (Amitriptyline) to treat this condition. *Id.* pp. 308, 309, 310, 312, and 328. The social isolation experienced because the pandemic aggravates these conditions. The CDC has recognized that the pandemic is causing and affecting this condition in the population in general. To give a concrete example, imagine the psychological impact that being locked down 23 hours a day or even 18 hours a day, coupled by the fear of catching a deadly disease, can have on a person that is already suffering from anxiety and has already caught the virus.

A CDC report states the following:

Elevated levels of adverse mental health conditions, substance use, and suicidal ideation were reported by adults in the United States in June 2020. The prevalence of symptoms of anxiety disorder was approximately three times those reported in the second quarter of 2019 (25.5% versus 8.1%), and prevalence of depressive disorder was approximately four times that reported in the second quarter of 2019 (24.3% versus 6.5%) (2).

Mental Health, Substance Use, and Suicidal Ideation During the COVID-19 pandemic — United States, June 24–30, 2020.[15]   Mr. Gonzalez, his mother,

_____

[15] See https://www.cdc.gov/mmwr /volumes/69/wr/mm6932a1.htm

and his father have explained to Counsel that the anxiety also causes severe headaches, making it difficult for Mr. Gonzalez to function.  In fact, this caused him to withdraw from Drexel University. Please note that Mr. Gonzalez also suffers from migraine headaches caused by the bullet lodged in his head.

In closing, please note that the Pre-sentence Investigation Report, in ¶¶ 46, 49, 50, and 51, confirms many of these conditions. Copies of the relevant pages of the PSR are attached hereto as *Exhibit* "I."

Therefore, it is respectfully submitted that Mr. Gonzalez's medical conditions, combined with the pandemic, constitute extraordinary and compelling reasons.

Other Factors the Court Should Consider
<u>in Determining Extraordinary and Compelling Reasons</u>


The BOP Response to the
<u>Pandemic and the Conditions at FCI Fort Dix</u>

On March 26, 2020, and April 3, 2020, the U.S. Attorney General issued two memos directing the release of prisoners into home confinement due to the Coronavirus pandemic.  These memos did not result in a significant

number of inmates being placed in home confinement. As of today, only 7,941 inmates, which is 5.5 % out of the 123,530 inmates incarcerated in the BOP facilities, are in home confinement.[16] Mr. Gonzalez is not one of them.

To stop the virus, the BOP has locked down inmates for months to create social distancing. These lockdowns kept inmates 23 hours per day inside their cells for many months. Despite their good intentions, there are serious humanitarian issues with this practice. This draconian effort notwithstanding, thousands of inmates have been infected with COVID-19. According to the BOP, on January 8, 2021, there were 6,176 inmates and 2,019 BOP staff members with the COVID-19.[17] However, the total number of infections inside federal prisons has been much higher. As of January 11, 2021, according to the BOP Website, there have been 35647 inmates and 3,147 staff that have recovered from the virus.[18] A combination of the

_____

[16] *See* https//www.bop./coronavirus/faq.jsp

[17] *See* https://www.bop.gov/coronavirus/

[18] *Id.*

currently ill with the recovered results in a total of 41,823 inmates and 5,166 staff members that have been infected with the virus. If the BOP has approximately 123,119 inmates, this means that 34% of the inmates have contracted the virus. Clearly, this is an extremely high rate of infection. If 34% of our population had contracted the virus, more than 100 million Americans would have contracted the virus.    As such, the rate of infection in the BOP is extremely high and unacceptably dangerous. Last and not least, 179 inmates have died in federal prisons from COVID-19.[19] The pandemic converted the sentences of 179 inmates into death sentences. Please note that since 1963 only 13 prisoners have been executed by the Federal Government.

While the locked downs have been modified, they are still oppressive and inhumane. Currently,  Mr. Gonzalez, who is housed in the Fort Dix's Camp, is locked down 18 hours per day. He is housed in an open-air dormitory with 86 men.  The men are only allowed three hours a week

_____

[19] See https://www.nbcnews.com/health/health-news/live-blog/2020-04-02-coronavirus-news-n1174651/ncrd1175446#blogHeader

outdoors. Mr. Gonzalez sleeps, eats, and lives less than six feet away from five other men. In fact, Mr. Gonzalez explained to Counsel that he is again in isolation due to more COVID-19 positive tests in the Camp.

These are very harsh living conditions that are more punitive than what Mr. Gonzalez or the Court expected when it sentenced Mr. Gonzalez on September 22, 2015. In *United States v. Rodriguez*, 2018 U.S. Dist. LEXIS 146432, pp. 7 & 8, the Court stated that the locked downs imposed by the BOP to "protect the inmates constitute much severe and harsher conditions than expected at sentencing. Similarly, in *United States v. Lizardi*, 2020 U.S. Dist. LEXIS 188147, p. 7,  the court stated that a day spent in prison under extreme locked downs and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

These living conditions are also in violation of the CDC social distancing policies to prevent the spread of the virus. The CDC states:

Social distancing, also called "physical distancing," means keeping a safe space between yourself and other people who are not from your household.

To practice social or physical distancing, stay at least 6 feet (about 2 arms' length) from other people who are not from your household in both indoor and outdoor spaces.

COVID-19 spreads mainly among people who are in close contact (within about 6 feet) for a prolonged period. Spread happens when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose are launched into the air and land in the mouths or noses of people nearby. The droplets can also be inhaled into the lungs.

The CDC Social Distancing Policy Statement. *See* https://www.cdc.gov/

coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

As of December 31, 2020, FCI Fort Dix reported it had 442 inmate confirmed active COVID-19 cases and 11 staff confirmed active cases. FCI Fort Dix as of December 31, 2020 had 2,595 inmates. This means that there was a 17.03 percent rate of infection based on the current active COVID-19 cases. Since the outbreak, the BOP has confirmed that there has been a total of 942 inmates infected by the virus in FCI fort Dix.[20]  Further, Mr. Gonzalez

---

[20] This information was retrieved from *United States v. Harris*, 2020 U.S. Dist. LEXIS 245018, p. 8 (E.D. Pa. December 31, 2020).

has explained to Counsel that because of the overcrowding in Fort Dix's Camp, 58 out of 230 men have contracted the virus. This is a 25.26 rate of infection. This information is confirmed by the Declaration of James Reiser, a Case Management Coordinator at the BOP, that was included in *Robert Edward Whiteside v. Fort Dix Federal Prison*, 2020-CV-05544, Docket Entry 16-2, ¶ 22. It is impossible for Mr. Gonzalez to take any steps to protect himself. That is why he already caught the virus once. It is also possible that he can get infected again.

Last, the Court should also consider that between May 7, 2020, and October 1, 2020, in the middle of a pandemic, for five months, the BOP did not test the inmates for COVID-19 in FCI Fort Dix. This establishes that the BOP is incapable of properly caring for the inmates. Unfortunately, Mr. Gonzalez is incarcerated in this prison.

<u>The COVID-19 Outbreak and the Impact on Prisons</u>

While Counsel acknowledges that the Court may know the severity and impact the pandemic is causing in society and in the prisons, this document will nonetheless describe the pandemic and the impact on

prisons.  If the Court prefers, it can go to page 34, where this discussion concludes.

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.  As of January 11, 2021, COVID-19 has infected over  90.3 million people, leading to at least  1.93 million deaths worldwide.[21] In the United States, as of January 11, 2021,   there are over 22 million confirmed cases of COVID-19 and over 383,295 deaths.[22] As a result, the United States has experienced the highest number of infections and fatalities in the world. In New Jersey, as of January 11, 2021, COVID-19 has infected 584,828 people, leading to at least 19,886 deaths.[23] Unfortunately, the number of victims increases hourly, and by the time the Court considers this motion, the numbers will be much higher.

---

[21]*See* https://www.worldometers.info/coronavirus/?utm_campaign=home *Advegas1?*

[22] *See* https://www.worldometers.info/coronavirus/?utm_campaign= homeAdvegas1?#countries

[23] https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml

COVID-19 is mainly a respiratory disease spreading through droplets produced when an infected person, even one without symptoms, talks, coughs, or sneezes. The virus is also spread through the air. [24] Currently, COVID-19 is mutating, and it is believed to be even more contagious. This mutated version has already spread around the world and is already in several states, e.g., Connecticut, Colorado, California, Florida, and Texas. As it spreads, the mutated virus is expected to cause a more severe wave. No one knows how far this virus will go and how many people will die. Last and not least, scientists do not know whether the vaccines will work against the mutated virus. The scientists also do not know how long the vaccine will protect a person from the virus.

COVID-19 can be fatal. The best estimate for its overall fatality rate among all demographics—is 0.3-3.5%, "which is 5-35 times the fatality associated with influenza infection."[25] *See* Nick Wilson et al., *Case-Fatality*

_____

[24] *United States v. Harris*, 2020 U.S. Dist. LEXIS 245018, p.6.
[25] Declaration of Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5attached, as *Exhibit* "J."

*Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26(6) EID Journal (prepublication June 2020).[26] While fatality rates can vary significantly depending on environmental and demographic risk factors, the death rate for those considered at-risk is higher.

• 13.2% for people with cardiovascular disease;

• 9.2% for people with diabetes; Mr. Gonzalez is pre-diabetic;

• 8.4% for people with hypertension;

• 8% for people with chronic respiratory disease; Mr. Gonzalez has suffered from asthma most of his life.

• 7.6% for people with cancer[27]

As a result, the CDC has issued guidance that individuals that are over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes should take immediate preventative

---

[26] Available at https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[27] World Health Organization, Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) at 12 (Feb. 28, 2020), at https://www.who.int/docs/defaultsource/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

actions, including avoiding crowded areas and staying home as much as possible.[28]

Ethnicity

While not considered a pre-existing condition, certain ethnic groups in the United States, i.e., Latinos, have been severely affected by COVID-19. Latinos in the United States are approximately 18.3 percent of the population but are 26.1 percent of the deaths caused by COVID-19.[29] Latinos are also hospitalized because COVID-19 at four times the rate of whites in the United States.[30] See also, Also, Latinos being mostly poor, as Mr. Gonzalez, do not have the best diets or medical care. These factors make Latinos more likely to suffer greater consequences when they contract COVID-19. While in prison, Mr. Gonzalez will not have the best available medical care nor the

---

[28] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) https://bit.ly/2vgUt1P.

[29] NPR, Why COVID-19 Disproportionately Impacts the Hispanic Community, July 1, 2020 at https://www.npr.org/2020/07/01/885878571/why-covid-19-disproportionately-impacts-latino-communities

[30] *Id.*

best diet.

<u>Conditions of Confinement and Spread of COVID-19</u>

"*An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*."[31]

According to the CDC, the virus is mainly spread person-to-person "[b]etween people who are in close contact with one another (within about 6 feet)" and "[t]hrough respiratory droplets produced when an infected person coughs or sneezes."[32] The spread can be slowed, public health professionals say, if people practice "social distancing" by avoiding public spaces and generally limit their movement. "Social distancing" is not an option in prison.  In prisons, inmates are housed in closed quarters and forced to share bathrooms, laundry, and meal areas. The cell toilets rarely have lids, and the tank often doubles as the sink for handwashing. Air

---

[31] Dr. Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues, The New York Times (March 16, 2020).

[32] How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/about /transmission.html.

circulation is uniformly poor. "Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities." *See* Beyrer Dec., *Exhibit* "J," ¶ 13. These deficiencies now are a threat not only to those being housed there but to the community at large. "According to health experts, it is not a matter of if, but when, this virus breaks out of jails and prisons."[33] Conditions of confinement create the ideal environment for the transmission of a highly contagious disease such as COVID-19.[34] "It is, therefore, an urgent priority in this time of national public health emergency to reduce the number of persons in prison as quickly as possible." *See* Beyrer Dec., *Exhibit* "J," at ¶ 17. Here, Mr. Gonzalez spends either 23 or 18 hours a day locked down with five other men. He sleeps, eats, and lives less than six feet apart from these men. He has already contracted the virus. And he has multiple medical conditions.

---

[33] Dr. Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues, The New York Times (March 16, 2020). http://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.amp.html.

[34] Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in prisons and detention centers.[35] Many people who are incarcerated also have chronic conditions, such as diabetes or HIV, which make them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe." [36] Prisons have been referred to as Petri dishes[37] and tinderboxes for infectious diseases. [38]

---

[35] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, at https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[36] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[37] *Jails Are Petri Dishes: Inmates Freed As The Virus Spreads Behind Bars*, The New York Times, (March 30, 2020) (updated on March 31, 2020).

[38] *See United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. PA 2020).

Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[39] In China, officials have confirmed the Coronavirus is spreading at a rapid pace in Chinese prisons.[40] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[41] Extreme measures are necessary because as Dr. Homer Venters, former chief medical officer of the New York City jail system, made clear: "Coronavirus in these settings will dramatically increase the epidemic curve, not flatten it, and disproportionately for people of color."[42] The critical point

---

[39] Prisons and Jails are Vulnerable to COVID-19 Outbreaks, The Verge (Mar. 7, 2020) at https://bit.ly/2TNcNZY.

[40] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider (Feb. 21, 2020) at https://bit.ly/2vSzSRT.
[41] Jennifer Hansler and Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020) at https://cnn.it/2W4OpV7.

[42] Dr. Amanda Klonsky, An Epicenter of the Pandemic Will Be Jails and

from health experts is that slowing the rate of infection ("flattening the curve") is critical to avoid overtaxing health resources (which, if it occurs, would, of course, lead to more deaths for any given infection rate).[43] These resources are already scant in prison.

We are now in a situation where incarceration poses a grave public threat. As shown below, the epidemiological community agrees inmates should be released:

- Dr. Chris Beyrer from Johns Hopkins University:

 "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." *See Exhibit* "J," Beyrer Dec. ¶ 19.

- Dr. Robert B. Greifinger:

_____

Prisons, if Inaction Continues, The New York Times (March 16, 2020) at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.amp.html.

[43] See PBS News Hour graph, "One simple chart explains how social distancing saves lives" (Mar. 13, 2020), at https://www.pbs.org/newshour/science/one-simple-chart-explains-howsocial-distancing-saves-lives.

"Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention[.]" *See* attached as *Exhibit* "K" the Declaration of Dr. Robert B. Greifinger, ¶ 13.

- Dr. Marc Stern:

"As a correctional public health expert, I recommend the release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19." *See* attached as *Exhibit* "L" the Declaration of Dr. Marc Stern, ¶ 11.

- Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine:

"Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." *See* attached as *Exhibit* "M" the Declaration of Dr. Jaimie Meyer, ¶ 37.

It is respectfully submitted that Mr. Gonzalez's medical conditions, the pandemic, and the conditions inside the prisons constitute an extraordinary and compelling reason to grant Mr. Gonzalez's motion to reduce his sentence. The discussion below will show that the 3553(a) factors also support a finding that there are extraordinary and compelling reasons.

<u>The 3553(a) Factors</u>

<u>The Nature and Circumstances of the Offense</u>

Mr. Gonzalez participated in a drug trafficking offense involving 742 grams of Heroin and several firearms. While the offense is serious and firearms were found, at no time did Mr. Gonzalez attempt to discharge or point the firearm at anyone. As such, the offense did not involve a violent act on the part of Mr. Gonzalez. Thus, the circumstances of the offense should not outweigh Mr. Gonzalez's interest to avoid catching COVID-19 again. Considering that COVID-19 has killed over 380,000 people in the United States and that the prison where he is incarcerated already experienced a COVID-19 outbreak, protecting Mr. Gonzalez outweighs concern over the offense's conduct. Especially because Mr. Gonzalez already caught the virus

once, and there are no guarantees that he will not be infected again. The Court should also consider that Mr. Gonzalez has served over 78 months of his sentence and that he only has to serve 13 more months.

<u>The History and Characteristics of Mr. Gonzalez</u>

Mr. Gonzalez is a 44-year-old man that has been in custody for this case since July 17, 2014. At the time of his arrest on July 17, 2014, Mr. Gonzalez was 37 years old. Mr. Gonzalez was a young man in 2014, and he is still a young man today. He should be given an opportunity to return to society sooner rather than later.

Prior to his incarceration, Mr. Gonzalez attended Drexel University but withdrew before completing his degree due to medical problems. He has a child, and his parents are alive. His parents are fully supportive of Mr. Gonzalez and will support him if the Court reduces his sentence or allows him to serve his sentence in home confinement.

While in custody, he has had no disciplinary actions. He has participated in 54 educational programs. *See Exhibit* "B." These programs totaled more than 1,000 hours of instructional credits. Yet, he will not receive

any benefits for participation in those programs. He took the prison's Chef's Training Program. He now works as a cook. He has become a practicing Christian and regularly participated in religious services. He even led religious services for his fellow inmates. Presently, there are no religious services in FCI Fort Dix. He has maintained contact with his family. More importantly, he has apologized for the pain and anguish he caused them. He is a different person today than the person that committed the crimes for which he is incarcerated. It is respectfully submitted that his conduct and his achievements while incarcerated establish that he has been rehabilitated.

On this point, the Court should consider Mr. Gonzalez's words in determining the impact incarceration has had on him and the type of person he is today. On this subject, he stated:

> While I know my crime was grave, I cannot state strongly enough the ways in which my current incarceration has changed the man I am. It would be impossible for the Court to understand the life altering feeling of being put in prison for an extended sentence. I immediately understood the damage I had done not only to myself but to others.
>
> Being in an environment like this puts everything else in stark perspective. The things that are truly important in life become unavoidably evident. The love and support of my family, the

simplicity of the freedoms of everyday life, the availability of choice: those are the things I value most now.

These words demonstrate that Mr. Gonzalez is a different person today. It also demonstrates that he understands the seriousness of his conduct. Demonstrates his understanding of the need for respect for the law and that his conduct had to be punished. Finally, it also shows that he also understands the value of freedom and that to remain free, he must obey the law.

While this conduct took place after the initial sentence, the Supreme Court in *Pepper v. United States*, 562 U.S. 476, 490-493 (2011) makes it clear that during a resentencing, a court should consider post-sentencing rehabilitation. In fact, this behavior, as the Court stated, is extremely relevant to many of the § 3553(a) factors.

<u>The Need for the Sentence Imposed</u>

At sentencing, on September 22, 2015, the law did not allow the Court to determine what was the appropriate sentence for Mr. Gonzalez because the Court had to impose two mandatory minimum sentences, and the sentences had to run consecutively. Now, § 3582(c)(1)(A), gives the court

discretion. Section3582(c)(1)(A) states" . . . the court, upon motion may  . . . reduce the term of imprisonment and may impose a term of probation or supervised release . . with or without conditions that does not exceed the unserved portion of the original term of imprisonment . . . after considering the factors set forth in section 3553. . ." 18 U.S.C. § 3582(c)(1)(A). This gives the Court the discretion to apply the 3553(a) factors to determine if a reduction of the sentence is appropriate. It is respectfully submitted that under the circumstances, to keep the sentence imposed by the Court on September 22, 2015, would result in a sentence that is longer than necessary to address the 3553(a) factors.

The overarching principle of § 3553 is for the sentence to be sufficient but not greater than necessary.[44] In deciding this motion, it is respectfully submitted that the Court should make this determination considering today's circumstances.  It is submitted that reducing Mr. Gonzalez's sentence to time served or allowing him to serve the remaining portion of his sentence

---

[44] 18 U.S.C. § 3553(a) "The court shall impose a sentence sufficient, but not greater than necessary . . ."

in home confinement would be a sufficient sentence.

In computing the appropriate sentence, § 3553 directs the Court to consider the following factors: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of Mr. Gonzalez ; (D) to provide Mr. Gonzalez with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (E) to consider the sentencing alternatives; (F) to consider the PSR and the U.S. Sentencing Guidelines; and (G) to avoid unwarranted disparities. A discussion of these factors follows:

To Reflect the Seriousness of the Offense, to
<u>Promote Respect for the Law, and to Provide Just Punishment</u>

Reducing Mr. Gonzalez's sentence to time served or placing him in home confinement will not ignore the seriousness of the offense, constitutes just punishment, and still promotes respect for the law. Other than a time-served sentence, home confinement is the only way to account for an unexpected and extraordinary change of circumstances that endangers the

safety of Mr. Gonzalez. If the Court chooses home confinement, Mr. Gonzalez will still be confined. Only the confinement location changes. Further, protecting Mr. Gonzalez, especially when he has already been rehabilitated, has already served most of his sentence, and has several serious medical conditions, outweighs any value that can be gained by keeping him in jail. There is no value to society, the Courts, or Mr. Gonzalez for Mr. Gonzalez to remain incarcerated.

The Court should also consider Mr. Gonzalez's words quoted above, in the previous section, that also show that he understands the seriousness of his conduct, understands the need to obey and to promote respect for the law.

Finally, reducing his sentence or placing Mr. Gonzalez in home confinement does negate the seriousness of the offense. Mr. Gonzalez has served 78 months of his sentence. Serving 78 months reflects the seriousness of the offense, promotes respect for the law, and constitutes just punishment.

<u>To Afford Adequate Deterrence</u>

Here, reducing Mr. Gonzalez's sentence to time served or allowing him

to serve it in home confinement does not reduce the deterrence effect of the 120-month sentence imposed by the Court. Again, one must consider that we are in an unprecedented situation. The last pandemic took place 100 years ago. Presently we are on the worst wave of the pandemic, which is expected to get worse because of the virus' mutation. If Mr. Gonzalez gets infected again, he may not be as lucky the second time around. It will be a tragedy to convert Mr. Gonzalez's sentence into a death sentence when he has served 78 months when he can be protected by changing the location of where he serves his sentence.  Again, a 78-month period of incarceration is adequate deterrence. Respectfully, it is difficult to conceive, under the circumstances, that a  reduction or a modification of his sentence will reduce the deterrent effect of the original sentence.  In *United States v. Gardner*, U.S. Dist. LEXIS 129160, p. 8 (E.D. Mich July 22, 2020), the court, in a case involving a motion to reduce the sentence, stated that in evaluating the 3553(a) a court must weigh the value of deterrence against the increasing threat of a lethal infection.

<u>To Protect the Public from Further Crimes by Mr. Gonzalez</u>

If the Court reduces Mr. Gonzalez's sentence to time served, the public will be protected because he will be on four years of Supervised Release. If the Court allows Mr. Gonzalez to serve the sentence in home confinement, the public will also be protected from further crimes by Mr. Gonzalez because he will be in home confinement subject to electronic monitoring. When and if he is allowed to leave home confinement, he will be strictly controlled. Each time that Mr. Gonzalez wants to leave home confinement, he will have to obtain permission in advance. He will have to advise the Supervision Officer where he wants to go, why he needs to go, when he would like to leave home confinement, and when he will be back in home confinement. Thus, he will be controlled, and the community will be protected.

As part of the findings, the Court also has to find that if the motion is granted, Mr. Gonzalez will not be a danger to another person or to the community. U.S.S.G. § 1B1.13(2). It is respectfully submitted that Mr. Gonzalez will not be a danger to another person or to the community. He is

a different person today. His post-sentence rehabilitation, the 78 month period of incarceration, the 54 courses, the work in the prison, his decision to become a practicing Christian, his participation in the prison's religious activities, and his acknowledgment of his wrongdoing establish that he is a different person. His statement confirms that he is a rehabilitated person. He can not do anything else to show that he is not a danger to another or to the community.

The Court should also consider that Mr. Gonzalez is housed in Fort Dix's minimum Security Camp. He has being assigned an "out of custody" level. He has been designated by the BOP as a Minimum Security Classification. He has been given a minimum score under the BOP's Pattern Irish Analysis. This means that he is considered least likely to recidivate. These further support Mr. Gonzalez's position that he is not a danger to any one or to the community.

To Provide Defendant with the Needed Education,
Vocational Training, Medical Care, or Other Treatment

If the Court reduces Mr. Gonzalez's sentence to time served or places him in home confinement, conditions can be added to address his medical

needs, which are the only special needs he has. In fact, reducing his sentence or placing him in home confinement better addresses his medical needs by removing him from an environment where he can again be exposed to the virus, provides access to better health care, and provides access to a better diet. Outside of the prison, he can better address his medical conditions.

Mr. Gonzalez does not need to take additional courses. He has taken 54 education programs totaling more than 1,000 hours of instructional credits. More important, even if he wanted to take additional courses, due to the pandemic, Mr. Gonzalez has explained to Counsel that no courses are offered at Fort Dix's Camp.

Sentencing Alternatives

Section 3582 gives the Court the authority to reduce Mr. Gonzalez sentence or to place him in home confinement.

The PSR and Recommended Sentencing Guidelines

The PSR did not address this issue because it was not an issue at the time of sentencing.

### The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Under the circumstances of this case, reducing Mr. Gonzalez's sentence to time served or allowing him to serve the remaining sentence in home confinement does not constitute sentencing disparity. The very purpose of § 3582 allows for this possibility. Mr. Gonzalez's rehabilitation, the current pandemic, the 78 months he spent in prison, and Mr. Gonzalez's medical conditions are unique factors supporting a reduction of sentence.

As the last concern, Mr. Gonzalez wants to again address § 3553(a)'s goal that a sentence should not be longer than necessary. This Court, due to the pandemic, will have the opportunity to determine what is a sufficient sentence for Mr. Gonzalez. If the BOP is correct, Mr. Gonzalez has 25 months remaining in his sentence. Of these 25 months, he can theoretically serve 12 months in a halfway house leaving only 13 months to be served in prison or in home confinement. However, the reality is that Mr. Gonzalez will be lucky if he gets to serve any time in a halfway house. It is likely that due to space limitations created by the pandemic, he may have to serve the full sentence in custody.

It is respectfully submitted that nothing will be accomplished by keeping Mr. Gonzalez incarcerated for one more day. He will not be further rehabilitated. Any additional course he may take will not turn his life around, and there are no available courses. Presently, there is nothing constructive for Mr. Gonzalez to do in the Camp at FCI Fort Dix. Mr. Gonzalez's work, education, and religious involvement, while in prison demonstrates that he is a rehabilitated person. This is further demonstrated by Mr. Gonzalez's statement. Keeping Mr. Gonzalez in custody will unduly punish him and will cause unnecessary psychological pain. The psychological punishment is not only the result of being locked down many hours each day, but also the result of the anguish and stress caused by the fear of catching the virus, getting extremely ill, or even dying from the virus. Enduring this psychological stress when he already suffers from anxiety is unnecessary.

It is respectfully submitted that keeping Mr. Gonzalez incarcerated is a sentence that is longer than necessary, and qualitatively, a much more punitive sentence. The Court should reduce Mr. Gonzalez's sentence or

should place him in home confinement.

## Mr. Gonzalez's Plan if Released

If the Court grants this motion, Mr. Gonzalez will live with his mother Raquel Gonzalez at 14010 Clifford Lane, Philadelphia, PA 19116. His mother has agreed to allow him to stay with her indefinitely and to cover his expenses, including medical expenses, while he is in home confinement. Mr. Gonzalez also, if allowed by the Court, has obtained employment, and will work at M.J. Associates Steel, Co., Inc. 798 East Venango Street, Philadelphia, PA 19134. The Supervisor will be Benjamin Cruz. A copy of Mr. Cruz's statement is attached hereto as E*xhibit* "N."

## Conclusion

Mr. Gonzalez exhausted administrative remedies. As such, he has the right to file this motion. Most of the courts, and this district, have held that the sentencing court has the authority to determine whether a Defendant has established extraordinary and compelling reasons under U.S.S.G. § 1B1.13 (D). Those cases have also held that the Court can consider multiple factors in making the determination. Here, as argued above, Mr. Gonzalez has

raised the following factors: 1) the pandemic, 2) the conditions in Fort Dix's Camp, 3) his medical conditions,[45] 4) his rehabilitation[46], 5) the 78 out 102 months served in prison, and 6) the 13 months remaining to be served. It is respectfully submitted that these factors constitute extraordinary and compelling reasons. Also, an application of the 3553(a) factors as argued and demonstrated above, also support the granting of the motion. Finally, releasing Mr. Gonzalez will not place another person or the community in danger.

Therefore, it is respectfully submitted that keeping Mr. Gonzalez in prison only exposes him to unnecessary risk. Keeping him in prison does not promote deterrence and does not promote rehabilitation. Keeping him in prison only imposes unnecessary punishment.

Respectfully submitted,

/s/ José Luis Ongay
_____

José Luis Ongay

_____

[45] Asthma, anxiety, allergies, sinusitis, obesity, migraine headaches, pre-diabetes, and the residual effects of COVID-19.
[46] The 54 education programs, his jobs, his religious activities, the lack of disciplinary actions while in custody, and his statement.

Date: January 11, 2021

## CERTIFICATE OF SERVICE

I certify that on this date, a true and correct copy of this motion was served upon AUSA James Pavlock via email at james.pavlock@usdoj.gov.

/s/ José Luis Ongay
_____
 José Luis Ongay

Date: January 11, 2021